COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, McCullough and Decker
Argued at Norfolk, Virginia


ANDRE EUGENE SANDERS

v.      Record No. 1386-14-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE MARLA GRAFF DECKER
MAY 26, 2015


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Randolph T. West, Judge Designate

Charles E. Haden for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Andre Eugene Sanders entered conditional guilty pleas to four counts of drug possession

and two counts of assault and battery of a law enforcement officer.  On appeal, he contends that

the warrantless use of a trained police dog to sniff for illegal drugs outside the door of his motel

room on two separate occasions was an unreasonable search that violated his rights under the

Fourth Amendment of the United States Constitution.  We hold that the use of the drug detection

dog in this case was not a search on either occasion.  Consequently, we affirm the appellant's

convictions.

I.  BACKGROUND

In June 2012 and again in September 2012, Newport News police officers received an

anonymous tip that a man staying in a particular motel room in the city had drugs in his

possession.  As part of their investigation on each occasion, officers took a drug detection dog to

the motel and directed it to sniff for narcotics outside the room identified by the tipster.  In each

instance, the officers used the dog's positive alert as part of the basis for obtaining a search

warrant for the room. Each search led to charges against the appellant for possession of marijuana, a second or subsequent offense, in violation of Code § 18.2-250.1, and possession of cocaine, in violation of Code § 18.2-250. Based on the appellant's actions during the second encounter, he was also charged with assault and battery of two of the officers present at the scene, in violation of Code § 18.2-57(C).

Prior to trial, the appellant filed a motion to suppress. He contended that each search of his motel room was unconstitutional because the probable cause for each warrant depended, in part, on the fact that a drug detection dog located directly outside his motel room door alerted to odors emanating from the room. He argued that the police needed a warrant prior to conducting the dog sniff. No testimony was offered at the suppression hearing. The court made its ruling after reviewing the affidavits supporting the search warrants, viewing photos of various parts of the motel, and entertaining the arguments of the parties.[1]

One of the affidavits accompanying the June 7 warrant application represented that officers began their investigation based on an anonymous tip that a man staying in Room 236 of a particular motel was in possession of cocaine and a weapon. The tip further indicated that the man had a lot of money and was driving a red or burgundy Thunderbird.

Photographs of the motel showed the layout of the building. All motel room doors opened to an outside walkway that connected several different rooms located on the same floor. Room 236 was on the second floor of the motel. The walkway outside the second-floor rooms was bordered by a traditional, waist-high metal railing with thin vertical posts. The design of the

---

[1] In reviewing the denial of a motion to suppress, we view the facts, inferences from those facts, and credibility determinations in the light most favorable to the Commonwealth, the party that prevailed below. See, e.g., Malbrough v. Commonwealth, 275 Va. 163, 168-69, 655 S.E.2d 1, 3 (2008). In this appeal, with one minor exception, see infra note 4, no dispute exists concerning the facts upon which the ruling on the motion to suppress was based. The issue, instead, concerns the legal significance of those facts.

railing was such that the walkway area and motel room doors and windows were fully visible from the adjacent parking lot.

Surveillance of Room 236 on June 7 confirmed that a man entered and then exited the room. While officers maintained surveillance on the room, the man drove away in a red Thunderbird. As the man returned to the area of the motel, detectives obtained probable cause to stop the vehicle and did so.[2]

Police identified the driver of the Thunderbird as the appellant and learned he was driving "with suspended tags" and a suspended license. As an officer prepared a summons for the appellant, another officer, Detective C.L. Brown, walked his drug detection dog, Whiskey, around the Thunderbird. Whiskey "alert[ed]" to the odor of drugs "coming from the vehicle." In a search of the car, police found marijuana residue. Additionally, a key to Room 236 was discovered on the appellant's person.

Detective Brown then walked Whiskey "around [several] rooms in the area of [Room 236]." Prior to "alert[ing] to room 236," Whiskey sniffed "the bottom and side seams of the door jambs," as well as the exhaust portion of the operating air conditioner that was ventilating the room. The room had been under constant surveillance since the appellant had departed it.

Based on this information, a third officer applied for and received a warrant that same day to search Room 236. The search yielded illegal drugs, drug paraphernalia, and cash.

Similar circumstances led to the search of a different room at the same motel about three months later, on September 12. The affidavit supporting the warrant application represented that on that date, police received information that the appellant was occupying and distributing narcotics from the room "immediately to the left of room 215." The source also provided information that the appellant had United States currency, marijuana, cocaine, and firearms

---

[2] The basis for probable cause for the stop is not challenged on appeal.

inside the room. Police confirmed that the appellant's criminal record contained "extensive history" involving the possession and distribution of illegal drugs and "previous violations" involving firearms. Police also knew that the information received that day came from "the same anonymous source" who had provided accurate information about the appellant for the June search warrant.

Prior to applying for a warrant on September 12, law enforcement confirmed that the appellant was a registered guest in Room 217, which was immediately to the left of Room 215 as the tip had indicated. Room 217, like Room 236, was a second-floor room adjacent to an external walkway that connected numerous rooms on one side and had the same type of open railing on the other side.

During the course of surveillance, the appellant was seen leaving Room 217. Detective Brown then led Whiskey to conduct "a free air sniff" outside the room, after which she sniffed "the bottom and side seams of the door jambs." Whiskey gave "a positive alert to the presence of the odor of narcotics emanating from inside the room." When the appellant returned to the room, detectives arrested him. The appellant waived his right to counsel and admitted that he had been smoking marijuana in the room. With this information—including the partially corroborated tip, the drug dog's alert, and the appellant's admission—police obtained a search warrant for Room 217. The search resulted in the discovery of illegal drugs.

The circuit court, after reading the warrant applications, viewing the photographs, and hearing argument, denied the motion to suppress. The court ruled that the warrantless use of the drug detection dog outside the motel rooms did not violate the appellant's reasonable expectation of privacy and, therefore, did not constitute a search. Accordingly, it concluded that the warrants were supported by probable cause and the searches inside the rooms were proper.

The appellant entered conditional guilty pleas to the six offenses. He was convicted and sentenced to serve twenty-eight years' incarceration, with twenty-two years suspended.

## II. ANALYSIS

The appellant contends that the warrantless use of a trained narcotics detection dog to sniff for drugs outside the external door of his motel room on two separate occasions was an unreasonable search in light of the ruling of the Supreme Court of the United States in Florida v. Jardines, 133 S. Ct. 1409 (2013). The Commonwealth argues that a dog sniff outside a motel room is not a search for purposes of the Fourth Amendment. We hold that, under Jardines and other precedent, neither of the dog sniffs was a search. Consequently, we affirm the appellant's convictions.[3]

### A. Overarching Legal Principles

On review of the denial of a motion to suppress, the appellant bears the burden of showing that the ruling, "'when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

The Fourth Amendment of the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

---

[3] The Commonwealth argues in the alternative that the good faith exception to the exclusionary rule applies or that any errors were harmless. An appellate court decides cases on the best and narrowest ground. Luginbyhl v. Commonwealth, 48 Va. App. 58, 64, 628 S.E.2d 74, 77 (2006) (en banc). We hold that the best and narrowest ground here is our conclusion, which affirms the trial court's ruling on the same point, that using a drug detection dog outside the appellant's motel room was not a search. See, e.g., Armstead v. Commonwealth, 56 Va. App. 569, 575-76 & n.3, 695 S.E.2d 561, 564 & n.3 (2010) (holding that the constitutional issue rather than the exclusionary rule claim or procedural bar question was the best and narrowest ground for decision), cited with approval in Abdo v. Commonwealth, 64 Va. App. 468, 473 n.1, 769 S.E.2d 677, 679 n.1 (2015).

and seizures." U.S. Const. amend. IV. Since the Supreme Court's decision in <u>Katz v. United States</u>, 389 U.S. 347 (1967), "the touchstone" of Fourth Amendment analysis has been "the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'" <u>Oliver v. United States</u>, 466 U.S. 170, 177 (1984) (quoting <u>Katz</u>, 389 U.S. at 360 (Harlan, J., concurring)), <u>quoted with approval in</u> <u>Rideout v. Commonwealth</u>, 62 Va. App. 779, 786, 753 S.E.2d 595, 599 (2014). As the Supreme Court has repeatedly made clear, however, the decision in <u>Katz</u> did not "'snu[f] out'" the previously recognized protection for property; rather, <u>Katz</u> "established that 'property rights are not the sole measure of Fourth Amendment violations.'" <u>United States v. Jones</u>, 132 S. Ct. 945, 951 (2012) (quoting <u>Soldal v. Cook Cnty.</u>, 506 U.S. 56, 64 (1992)) (holding that attaching a GPS device to the bumper of a motor vehicle was a trespass to property and, therefore, an unconstitutional search). In fact, the Court has "embodied that preservation of past rights in [the] very definition of 'reasonable expectation of privacy,'" which is "an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" <u>Id.</u> (quoting <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998)).

Determining whether particular action by law enforcement constitutes a search for purposes of the Fourth Amendment involves a two-pronged test. First, a defendant must show "'that he personally has an expectation of privacy in the place searched.'" <u>Rideout</u>, 62 Va. App. at 786, 753 S.E.2d at 599 (quoting <u>Carter</u>, 525 U.S. at 88). Second, he must prove that his expectation is objectively "reasonable" based on "'a source outside of the Fourth Amendment.'" <u>Id.</u> (quoting <u>Carter</u>, 525 U.S. at 88) (internal quotation marks omitted). The defendant may establish such a source by reference to either: (1) "'concepts of real or personal property law'" or (2) "'understandings that are recognized and permitted by society.'" <u>Jones</u>, 132 S. Ct. at 951 (quoting <u>Carter</u>, 525 U.S. at 88).

We assume without deciding that the appellant manifested a subjective expectation of privacy in the area directly outside his motel rooms.  Consequently, the question before us is whether such an expectation was objectively reasonable based on a property interest or other societal norm.  This is a legal determination that we review *de novo*.  McCary v. Commonwealth, 36 Va. App. 27, 35-36, 548 S.E.2d 239, 243 (2001).

### B.  The Holding in *Florida v. Jardines*

A classic example of an area in which one has an objectively reasonable expectation of privacy based on concepts of property law is the curtilage of one's home.  See, e.g., Foley v. Commonwealth, 63 Va. App. 186, 194-95, 755 S.E.2d 473, 477-78 (2014).  It is this property-based concept of privacy rights, analyzed by the Supreme Court in Jardines, upon which the appellant primarily relies.

In Jardines, the Court considered whether the use of a drug detection dog on the front porch of a private residence was a Fourth Amendment search of that residence, requiring either (1) a warrant or (2) probable cause and exigent circumstances.  133 S. Ct. at 1413-18.  In conducting this analysis, the Court highlighted the protections afforded to both the home and "the area 'immediately surrounding and associated with the home,'" referred to as the curtilage. Id. at 1414 (quoting Oliver, 466 U.S. at 180).  It emphasized:

> [W]hen it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  This right would be of little practical value if the State's agents could stand [on] a home's porch or [in its] side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

Id. (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).  The Court noted the "ancient and durable roots" of the principle that the curtilage "is 'intimately linked to the home,

- 7 -

both physically and psychologically,' and is where 'privacy expectations are most heightened.'" Id. at 1414-15 (quoting California v. Ciraolo, 476 U.S. 207, 213 (1986)).

In contrast to areas qualifying as curtilage, the Court juxtaposed "open fields." Id. at 1414. It noted that the Fourth Amendment does not "prevent all investigations conducted on private property." Id. It made clear that private property classified as "open fields" may be searched without a warrant or exigent circumstances because such areas are not considered to be protected by the Fourth Amendment. Id.; see Johnson v. Commonwealth, 26 Va. App. 674, 684, 496 S.E.2d 143, 148 (1998) (noting that an area "'need be neither "open" nor a "field" as those terms are used in common speech'" in order to be so classified for Fourth Amendment purposes (quoting Dow Chem. Co. v. United States, 476 U.S. 227, 236 (1986))).

Based on these principles, the Court recognized in Jardines that the front porch is "the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" 133 S. Ct. at 1415 (quoting Oliver, 466 U.S. at 182 n.12). It then proceeded to analyze whether the officers' investigation in a constitutionally protected area "was accomplished through an unlicensed physical intrusion." Id. It noted that despite strict common law rules preventing entry upon the property of another without permission, the "'license . . . implied from the habits of [our] country' . . . typically permits [a] visitor to approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. (quoting McKee v. Gratz, 260 U.S. 127, 136 (1922)). The Court reasoned, therefore, that a police officer, without a warrant, may approach a home and knock on the door because a private citizen may engage in the same behavior. Id. at 1416. However, it concluded that "background social norms that invite a visitor to the front door" do not include an "implied[] invit[ation] to enter the protected premises of the home in order to do nothing but conduct a search." Id. at 1416 & n.4.

- 8 -

The Court made clear that it was not overruling its line of cases which hold that "canine inspection[s] of luggage in an airport" or "an automobile during a lawful traffic stop[] do not violate the 'reasonable expectation of privacy' described in Katz." Id. at 1417 (citing United States v. Place, 462 U.S. 696 (1983); Illinois v. Caballes, 543 U.S. 405 (2005)). It emphasized that the Katz test, upon which it had relied to validate dog sniffs, "'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment." Id. (quoting Jones, 132 S. Ct. at 952). As a result, the Court explained, it is unnecessary to engage in a broad expectation-of-privacy analysis under Katz when the government has obtained evidence "by physically intruding on [a] constitutionally protected area[]." Id.

In Jardines, "the officers learned what they learned only by physically intruding on [the defendant's] property to gather evidence." Id. The Court held that this physical intrusion, standing alone, proved an unlawful search. Id. at 1417-18; see Jones, 132 S. Ct. at 951-52. It is in the context of this holding that we must determine whether the appellant had an objectively reasonable expectation of privacy that was violated by the presence of the police dog outside his motel room doors.

### C. Application of Fourth Amendment Principles

The appellant alleges that each of the motel rooms, on each of the two days in question, was his home for purposes of the Fourth Amendment.[4] Accordingly, he contends that he was entitled to the same protections on the external walkway adjacent to the door of each motel room that the defendant in Jardines was entitled to on the front porch of his home. We conclude that

---

[4] The appellant argues that he was "actually living" at the motel and, as a result, was entitled to have the area outside the motel rooms either classified as protected curtilage or recognized as an area in which he had an objectively reasonable expectation of privacy. We need not determine what impact the appellant's residing more permanently in the motel might have on our analysis because the record proves only that the appellant had a key to Room 236 on the day it was searched and was registered in Room 217 three months later, on the day that room was searched. See, e.g., Smith v. Commonwealth, 16 Va. App. 630, 635, 432 S.E.2d 2, 6 (1993).

settled legal principles dictate a contrary result under an analysis of both property rights and reasonable-expectation-of-privacy principles.

### 1. *Property Interests in Motel Rooms and External Walkways*

The Fourth Amendment protects a person's home from "unreasonable governmental intrusion." Alexander v. Commonwealth, 19 Va. App. 671, 673, 454 S.E.2d 39, 40 (1995). Absent probable cause and exigent circumstances, "the threshold to a person's home cannot be crossed without a warrant." Id. at 673, 454 S.E.2d at 41 (citing Payton v. New York, 445 U.S. 573, 590 (1980)). The rights of a motel guest are equal to those of the rightful occupants of a home. Servis v. Commonwealth, 6 Va. App. 507, 514, 371 S.E.2d 156, 159 (1988) (citing Stoner v. California, 376 U.S. 483, 490 (1964)). As a result, the warrantless entry of one's home or motel room is "presumptively unreasonable." Id. However, the fact that occupants' rights *inside* the two types of premises are the same does not mean that their rights *outside* those premises are necessarily entitled to equivalent Fourth Amendment protections. The decision in Jardines clearly rests on the concept that the area immediately surrounding and associated with a private residence usually qualifies as curtilage, an area entitled under the common law to the same protections as the home itself. However, Jardines does not purport to alter the existing definition of curtilage or extend its holding to the exterior of other types of premises.

As summarized in the context of the analysis in Jardines, see supra Part II.B., curtilage is "historically understood to refer to an extension of the home that is so intertwined with the home that the law must provide it the same [Fourth Amendment] protection as the home itself." Foley, 63 Va. App. at 195, 755 S.E.2d at 478 (citing Jardines, 133 S. Ct. at 1414-15). "[T]he boundaries of a home's curtilage are primarily defined by *their relationship with the home . . .* rather than *mere* physical proximity or ownership." Id. at 194, 755 S.E.2d at 477 (second emphasis added). The relevant contemporary inquiry is the area's "connection to the residence

and its role in the lives of its occupants." Id. at 195, 755 S.E.2d at 477. "While an area's use by third parties may be relevant in determining whether the area is in the home's curtilage, that fact alone does not categorically exclude it. Instead, courts must look to the area's use and connection to the home itself . . . ." Id. at 195-96, 755 S.E.2d at 478 (emphasis omitted).

In determining whether particular property falls within the curtilage, courts consider the following factors to the extent they are relevant in a specific case:

> "[(1)] the proximity of the area claimed to be curtilage to the home, [(2)] whether the area is included within an enclosure surrounding the home, [(3)] the nature of the uses to which the area is put, and [(4)] the steps taken by the resident to protect the area from observation by people passing by."

Id. at 196, 755 S.E.2d at 478 (alterations in original) (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)). Applying these principles, we conclude that the walkways immediately outside of the appellant's two different motel rooms did not qualify as curtilage.

Under the first factor, the walkways at issue were in close proximity to the rooms and provided the only apparent means of ingress and egress. Nevertheless, a single factor of the test is not dispositive, and we must consider the remaining factors in our analysis.

Under the second factor, the areas at issue were not inside any sort of enclosure indicating an intent to maintain individual privacy. Each second-floor walkway was flanked by a waist-high metal railing with thin vertical posts. This railing was on the opposite side of the walkway from the motel room doors and did not prevent anyone from approaching the doors. Nor did it obstruct the view of the walkway or motel room doors from the adjacent parking lot. Further, no railing bordered the otherwise identical first-floor walkway, reinforcing the inference that the second-floor railing was present for safety rather than privacy purposes.

In addition, under the third factor—the nature of the use of the area—a motel's registered guest acquires a license to use the motel's common areas, including the walkways leading to the

guest's room. However, beyond this license for ingress and egress, nothing in the record establishes that the registered guest obtained either a property interest in any of the areas outside the rented room or a right to exclude others from those areas. See, e.g., Marullo v. United States, 328 F.2d 361, 363 (5th Cir. 1964) (holding that unlike the area around one's home, an occupant of a motel "must share corridors, sidewalks, yards, and trees with the other occupants"). In fact, a reasonable inference from the record reflects the contrary. The walkway immediately outside each of the appellant's rooms was necessarily a common area used by the renters, their guests, motel staff, and anyone else on the premises to gain access to the various rooms. Accordingly, any sights, sounds or smells emanating from the rooms might be sensed by others using the walkways.[5]

Finally, under the fourth factor, nothing had been done by the guests to protect the areas from people passing by the motel room doors. The photos of the walkways do not depict any personal items such as plants, lawn furniture, or welcome mats, which might indicate that the areas were deserving of protection through classification as curtilage.

Consequently, under the Dunn factors adopted in Foley, the area outside each room was not curtilage of the appellant's temporary dwellings. See Wayne R. LaFave, Search and Seizure § 2.3(c), at 39 (5th ed. Supp. 2014) (noting that the impact of Jardines on Fourth Amendment analysis may be limited to "single-unit dwellings" because "the concept of 'curtilage' appears to

_____

[5] At trial, the appellant offered photos of "No Trespassing" signs posted on the motel property. However, no testimony was offered as to the significance of those signs in the context of the appellant's claim. Also, nothing in the record establishes that law enforcement lacked the permission of motel management to be on the property. On appeal, the appellant does not assert that the "No Trespassing" signs were relevant to an assessment of his Fourth Amendment rights. In fact, he did not include these photos in the appendix, and he made no mention of the signs on brief or in oral argument. Therefore, we do not consider these signs in resolving the appeal. See Rule 5A:20(d), (e); Mason v. Commonwealth, 64 Va. App. 599, 610 n.8, 770 S.E.2d 224, ___ n.8 (2015); Yap v. Commonwealth, 49 Va. App. 622, 629, 643 S.E.2d 523, 526 (2007); see also Jay v. Commonwealth, 275 Va. 510, 518, 520, 659 S.E.2d 311, 316, 317 (2008) (permitting this Court to treat an entire issue as waived if the failure to comply with Rule 5A:20(e) is significant).

have little [if] anything to do with multiple-unit structures").[6] As a result, the presence of the drug detection dog on the walkways did not run afoul of Jardines.

## 2.  Other Societal Norms Establishing an Objectively Reasonable Expectation of Privacy

We must next consider whether any other circumstances demonstrate that the appellant had an expectation of privacy that society is prepared to recognize as reasonable outside either of his motel room doors.  We hold that the appellant did not have an objectively reasonable expectation of privacy in the walkways directly outside those doors or in the odors detectable by a drug dog while standing on such walkways.

### a.  Walkways

Whether an occupant of a motel room has a reasonable expectation of privacy in the external walkways adjacent to it has not been addressed by Virginia's appellate courts.  In Logan v. Commonwealth, 47 Va. App. 168, 622 S.E.2d 771 (2005) (*en banc*), this Court considered an occupant's privacy interest in the common areas of a rooming house.  The Court observed that the Commonwealth had made a factual concession that the rooming house premises were "*not open to the general public*," and it concluded that this concession resolved the question whether residents had a reasonable expectation of privacy in the relevant areas of the rooming house.  47 Va. App. at 171, 622 S.E.2d at 772-73.  In Londono v. Commonwealth, 40 Va. App. 377, 397, 579 S.E.2d 641, 650-51 (2003), the Court evaluated the expectation of privacy of the occupant of

---

[6] Other courts have reached this same conclusion.  See United States v. Jackson, 728 F.3d 367, 370, 373-74 (4th Cir. 2013) (in a post-Jardines decision, classifying a concrete patio located directly behind each two-story, "rowhouse type" unit in an apartment building as curtilage while categorizing the sidewalk beyond the patio as outside the curtilage), cert. denied, 134 S. Ct. 1347 (2014); United States v. Legall, 585 Fed. Appx. 4, 2014 U.S. App. Lexis 19994, at *2-*3 (4th Cir. 2014) (unpub'd) (applying the four-factor test of Dunn to conclude that the area outside an interior hotel room door was not curtilage), cert. denied, 135 S. Ct. 1471 (2015); cf. Reeves v. Churchich, 484 F.3d 1244, 1254-55 (10th Cir. 2007) (prior to Jardines, classifying the front yard of a duplex, which was not fenced or otherwise shielded from public view and from which no evidence established that either tenant had a right to exclude the other, as open fields).

a sleeping compartment on a train. It held that the occupant had a lower expectation of privacy than in a fixed dwelling and no reasonable expectation that the police would not use the public hallway outside his compartment. Id. Therefore, Londono, like Logan, although instructive, does not resolve the issue currently before the Court.

Assessing whether a defendant had an objectively reasonable expectation of privacy in a particular location involves an analysis of the totality of the circumstances. See McCary, 36 Va. App. at 36, 548 S.E.2d at 243. Factors considered when applying this analysis are much like the considerations that Dunn specifies for assessing whether property is curtilage. See supra Part II.C.1. They include whether the defendant: (1) owned the property, had a possessory interest in it, or was legitimately on the premises; (2) had the right to exclude others from it; (3) demonstrated a subjective expectation of privacy that it would remain free from governmental intrusion; and (4) took normal precautions to maintain his privacy. See McCoy v. Commonwealth, 2 Va. App. 309, 311-12, 343 S.E.2d 383, 385 (1986); State v. Talley, 307 S.W.3d 723, 731, 734 (Tenn. 2010). The general rule regarding dwellings such as apartment buildings and motels is that an occupant has no legitimate expectation of privacy in areas subject to common use. See Wayne R. LaFave, Search and Seizure § 2.3(c), at 758-62 (5th ed. 2012). This rule applies to external and internal hallways, even those immediately adjacent to private areas such as individual apartments and motel rooms. Id.[7]

In keeping with the general rule, an assessment of the totality of the circumstances supports the conclusion that the appellant had no objectively reasonable expectation of privacy in the external motel walkways. The walkways belonged to the owner, not the occupants of the individual rooms, and no evidence indicated that the police lacked permission to be present on

---

[7] A majority of federal and state courts considering this issue have reached the same conclusion regarding the unlocked common areas in multi-unit dwellings. See United States v. Miravalles, 280 F.3d 1328, 1331-33 (11th Cir. 2002); Talley, 307 S.W.3d at 731-32 & n.4.

the walkways. The appellant had a possessory interest in the two rooms themselves, but as to the walkways, his interest, like that of the other motel guests, was one of common, not exclusive, use and access. See United States v. Miravalles, 280 F.3d 1328, 1332 (11th Cir. 2002) (reasoning that common areas in an apartment building are available for the use of other tenants, visitors of other tenants, the landlord, delivery people, repair workers, and the like). The outside walkway of a motel, unlike a traditional curtilage, frequently must be traversed at all hours by strangers, including guests and hotel staff. Although the appellant had a reasonable expectation of privacy inside the rooms he rented, he had no expectation of privacy in the sights, sounds, and smells detectible without unconstitutional intrusion from outside each room. See infra Part II.C.2.b. & n.8. Accordingly, the presence of law enforcement officers on the motel walkways was not a search within the meaning of the Fourth Amendment.

### b. Drug Detection Dogs and Odors

We turn to whether the use of a drug detection dog in this location somehow converted the presence of the police into an unlawful search. The law is well established that a canine sniff, standing alone, is not a search for purposes of the Fourth Amendment. The Supreme Court explained in Place, 462 U.S. at 707, that the canine sniff was unique at that time because "no other investigative procedure [was] so limited," both in the manner of obtaining the information and "in the content . . . revealed." See Wright v. Commonwealth, 52 Va. App. 263, 270-71, 663 S.E.2d 108, 112-13 (2008); Alvarez v. Commonwealth, 24 Va. App. 768, 775, 485 S.E.2d 646, 649-50 (1997).

The Supreme Court reaffirmed these principles more than twenty years later in Caballes, 543 U.S. 405, which involved a dog sniff during a traffic stop. The Court recognized that the use of "a well-trained narcotics-detection dog" during a lawful traffic stop "generally does not implicate legitimate privacy interests" because such use "'does not expose noncontraband items

that otherwise would remain hidden from public view.'" Id. at 409 (quoting Place, 462 U.S. at 707); see Wright, 52 Va. App. at 270-71, 663 S.E.2d at 112-13. The Court ultimately concluded that governmental action which reveals only the possession of contraband does not compromise a legitimate privacy interest because any interest in possessing contraband cannot itself be deemed legitimate. Caballes, 543 U.S. at 408-09.[8]

Although Place involved a dog sniff of luggage and Caballes involved a similar sniff of a motor vehicle, the Supreme Court's observations in those cases are equally applicable to the facts here. See Jardines, 133 S. Ct. at 1416-17 & n.3 (citing Place and Caballes and stating explicitly that "[i]t is not the dog that is the problem" but, rather, the "physical[] intru[sion] on Jardines' property"); cf. Rodriguez v. United States, 191 L. Ed. 2d 492, 499-501 (2015) (approving the use of a drug detection dog during a traffic stop as long as the officers either conduct the sniff before the stop has concluded and without prolonging it, or develop independent reasonable suspicion to extend the stop). Key to the Supreme Court's decisions in those cases was that each law enforcement officer and his trained dog were at a location in which they had a right to be at the time of the sniff and alert. See Fitzgerald v. State, 864 A.2d 1006, 1012 (Md. 2004) (concluding that the "only relevant locational determination" is whether the dog was "permitted *outside* the object sniffed"). Similarly here, and in contrast to Jardines, the police officers and the drug detection dog were at a place in which they had a right to be at the time of each sniff. See supra Part II.C.1. Therefore, consistent with Place and its progeny, the dog sniff here was not a search.

---

[8] The Court distinguished Kyllo v. United States, 533 U.S. 27 (2001), in which it held that law enforcement's use of a thermal-imaging device from a public location outside a home to detect the growth of marijuana inside the home constituted an unlawful search. Caballes, 543 U.S. at 409. The Court explained that a dog sniff reveals only illegal activity but the thermal-imaging device in Kyllo was also "capable of detecting lawful activity." Id. at 409-10.

In addition, the manner in which the police used the drug detection dog exposed her to odors outside rather than inside the motel rooms. As used here, a dog "does not detect anything inside a [motel room], but merely detects the particulate odors that have escaped from a [motel room]. In that sense, the odors are no longer 'private,' but instead are intermingled with 'the public airspace containing the incriminating odor.'" United States v. Broadway, 580 F. Supp. 2d 1179, 1191 (D. Colo. 2008) (quoting United States v. Morales-Zamora, 914 F.2d 200, 205 (10th Cir. 1990)), appealed and aff'd on other grounds, 358 Fed. Appx. 18 (10th Cir. 2009) (unpub'd); see also United States v. Marlar, 828 F. Supp. 415, 419 (N.D. Miss. 1993) (holding that a trained drug dog, similar to a flashlight, does "little more than [enhance] the officer's own senses").

Finally, the use of the trained dog, Whiskey, to detect the odor of illegal drugs outside the motel rooms did not reveal any information other than the likely presence of contraband. See Caballes, 543 U.S. at 409-10. Thus, viewed objectively, this use did not violate the appellant's reasonable expectation of privacy.[9]

### III. CONCLUSION

We hold that the dog sniffs conducted on the common external walkways outside the appellant's motel room doors were not searches under the Fourth Amendment. Therefore, the

---

[9] Courts in other jurisdictions have reached this same conclusion. See United States v. Roby, 122 F.3d 1120, 1124-25 (8th Cir. 1997) (approving a dog sniff in the common corridor of a hotel); Marlar, 828 F. Supp. at 419 (approving a dog sniff of an exterior motel room door opening onto a public sidewalk and parking lot); see also Nelson v. State, 867 So. 2d 534, 535-37 (Fla. Dist. Ct. App. 2004) (approving a dog sniff of a hotel hallway); State v. Washburn, 685 S.E.2d 555, 558-60 (N.C. Ct. App. 2009) (approving a dog sniff in the common hallway of a storage facility); Kenneth J. Melilli, Dog Sniffs, Technology, and the Mythical Constitutional Right to Criminal Privacy, 41 Hastings Const. L.Q. 357, 357 (2014) ("Assuming that the physical location of the dog at the time of the sniff is not itself [a Fourth Amendment] intrusion . . . , [the answer to] the question . . . whether the sniff itself constitutes a 'search' under the Fourth Amendment . . . is no . . . .").

search warrants obtained in part as a result of those canine alerts were valid, and the fruits of those searches were admissible in evidence.  Accordingly, we affirm the appellant's convictions.

<u>Affirmed.</u>